CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 2 7 2017

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SUBRENNA ROSS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:14-CV-00512 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| FRANKLIN COUNTY BOARD ) | By: Hon. Glen E. Conrad |
| OF PUBLIC WELFARE, ) | Chief United States District Judge |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff Subrenna Ross filed the instant action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. This matter is currently before the court on defendant's motion for summary judgment. For the reasons stated, the motion will be denied in part and granted in part.

**Factual and Procedural Background**

The following facts are either undisputed, or, where disputed, are presented in the light most favorable to Ross. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Plaintiff Subrenna Ross is a 50-year-old African-American woman. She has been employed with the Franklin County Board of Public Welfare (the "Board") and Department of Social Services (the "Department") since July of 1994. After several years, Ross was promoted to the position of self-sufficiency supervisor. She was the only African-American supervisor, and she kept the self-sufficiency supervisor position until December 3, 2013, when she was demoted to self-sufficiency worker. Ross was reinstated to the position of self-sufficiency supervisor in late 2015.

The Board's Human Resources Manual provides for three types of office offenses: Group I, the least severe, Group II, and Group III, the most severe. See Administrative/Human Resources Manual for LDSS, Docket No. 91-5 at 41. The policy sets out the various disciplinary procedures for each type of offense. Id. at 46-47. Two Group II offenses within a three-year time period will result in a written notice and termination. A Group III offense will result in termination. Id. The supervisor may take into account relevant mitigating factors in determining the disciplinary action to take. Id.

In April of 2011, the Board hired Deborah Powell to serve as director of the Department. At that time, the majority of the employees were Caucasian. Powell Dep. 120:7-8, Docket No. 91-1. During Powell's tenure, many of the older workers left. Ross alleges that they were replaced with younger workers. Ross Dep. 30:18-24, Docket No. 91-4. Powell was Ross' direct supervisor until November 1, 2013, when the Board promoted Anita Turner to the position of assistant director. Powell Dep. 10:23-15:17. Once Turner took this position, Turner supervised Ross.

In March of 2013, Powell issued Ross a Group II Written Notice, suspending Ross for four days. The Written Notice indicates that Ross directed an employee to ignore certain policies in relation to a benefits program administered by the Department. See LDSS Written Notice Form March 3, 2013, Docket No. 91-2 at 48. On October 5, 2013, Ross married a Caucasian man. Powell attended the wedding and knew prior to the wedding that Ross' husband is Caucasian. Ross Dep. 8:11-9:2.

On October 18, 2013, Franklin County sponsored an employee appreciation luncheon, to which Board employees were invited. A group of employees from a unit Ross did not supervise

2

went to the luncheon, which was located off-site, leaving their unit unstaffed. When the employees returned to the building, Ross told them that they should not have left their unit unstaffed. Powell Dep. 40:1-16. According to Powell, there is no policy that a unit cannot leave together, provided there is coverage in the building. Id. 39:8-16. Employees later expressed to their supervisors that they felt that Ross had handled the situation inappropriately. Id. 44:7-11.

Ross took leave for her honeymoon in early November. At some point in time, Powell met with the other Department supervisors. Typically, these meetings included Ross. Powell Dep. 55:11-22. At this meeting, the supervisors informed Powell that their employees had complained about Ross' behavior in regards to the county luncheon. Powell then instructed the supervisors to have employees contact Powell directly with any complaints. Id. at 54:15-19.

After November 7, 2013, Powell received several complaints regarding Ross' treatment of other employees. Id. 43:6-22. Powell initiated a formal inquiry into these complaints, following up with the complaining employees personally. Id. 53:5-14. On November 15, 2013, Powell suspended Ross so that she could complete the investigation. Id. 31:6-8. During this inquiry, Powell received information from at least ten different employees regarding Ross and the luncheon incident. See Docket No. 91-2 at 1-25. Written emails to Powell indicate that employees "felt like Subrenna was greatly stepping over her boundaries . . . [and] was very unprofessional." See Docket No. 92-2 at 2. Many employees expressed that they were intimidated by Ross and asked Powell not to disclose their complaints for fear of backlash from Ross. Id. at 5.

However, one employee, Beulah Faye Brown, stated that she was coerced to "go against Subrenna to try to get her to lose her job." Brown Dep. 9:22-24, Docket No. 103-5. Brown testified that Kathleen Miles, a supervisor, tried to tell Brown what to say about Ross. Id. 12:17-

3

19. Brown further testified that Miles attempted to coerce others to speak poorly about plaintiff, but they refused to do so. Id. 14:20-23. Defendant notes that Brown conceded that when she first met Ross, Brown felt intimidated by her. Id. 41:1-2. However, Brown also testified that she felt intimidated by Ross because of the things Miles said about Ross. Id. 41:4-24.

Thelma Doss, another employee at the Department, declared that she never experienced issues with Ross while they worked together, nor could she recall others complaining about Ross or feeling like they were intimidated by her. Dec. of Thelma Lane Doss, Docket No. 103-7. Powell testified that Doss "relayed to me that she was forced to partake in [watching plaintiff's wedding video]." Powell Dep. 50:9-16. Doss later asserted that she does "not recall watching Ross' wedding video . . . [or] any issues surrounding a wedding video." Docket No. 103-7. An African-American employee supervised by Ross testified that she had no problems with Ross. Arlaine Bryant Dep. 6:7-8, Docket No. 91-8. Powell also conceded that she received no complaints about Ross from any African-American employees. Powell Dep. 50:22-51:1.

Ross asserts that after she returned from her honeymoon, "everything just changed." Ross Dep. 9:22. For example, Ross testified that there was an accusation that Ross kept her door to her office closed. Other Caucasian supervisors would keep their door closed and not hear complaints about it. Ross Dep. 16:1-9. Ross also testified that she heard, from another employee, Maryanna Haines, that Brown had called Ross an "angry black woman." Id. 119:6-20. Ross further recalled a conversation she had with Linda Nesbit, another Department employee, in which Nesbit asked why Ross had been with the Department for so long without getting promoted. Ross then pointed to her skin. Ross testified that Nesbit's response was "well, [I] thought so." Id. 120:5-22. Finally, Ross alleges that she was excluded from one or two supervisory meetings sometime after September of 2013. Id. 10:11-11:1

4

On November 21, 2013, Powell issued a Notice of Intent to Ross. The Notice advised Ross that Powell was considering issuing a Group III Written Notice. See Notice of Intent, Docket No. 91-2 at 26. Ross was afforded the opportunity to respond and present her perspective. Id. However, Ross testified that she could not respond because she did not know what she did wrong. Ross Dep. 85:4-10. On December 3, 2013, Ross received a Group II Written Notice and was demoted from self-sufficiency supervisor to self-sufficiency worker. See Written Notice Dec. 3, 2013, Docket No. 91-2 at 31. The record indicates that at least one Caucasian supervisor was terminated for violating Department policy. Kathy Miles Dep. 7:4-14, Docket No. 91-7.

After receiving the Group II Written Notice, Ross was transferred to another building, moved from an office to a cubicle, did not have access to her computer for approximately one to two months, and was assigned to do Job Club. Ross contends that Job Club is typically contracted out on a part-time basis. Ross Dep. 18:4-23. Additionally, Ross testified that Powell complained that Ross was not working hard enough as a self-sufficiency worker, despite being delegated only part-time responsibilities. Id.

When Ross was demoted, Turner assumed Ross' supervisory responsibilities. As assistant director, a position she had held for only two weeks, Turner's job description included filling vacant supervisor positions. Turner Dep. 29:23-30:13, Docket No, 91-3. Ross had applied for the position, and alleges that she was much more qualified than Turner. For example, Ross had worked for the Department for twenty-two years; Turner had worked there for four. Moreover, Turner's background was in insurance—not social services. Turner Dep. 7:15-8:2. After Ross

5

was demoted, the self-sufficiency supervisor position was not formally filled, as the Department has a policy that it will not fill a supervisor position while the removed employee has the opportunity to assert his or her grievance rights. Id.

Prior to her demotion, Ross asserts that she had received positive reviews from her supervisors. Indeed, a June 2013 Employee Performance Evaluation Form notes Powell's satisfaction with Ross' communication abilities, and the "Review of Performance Evaluation" notes that Subrenna was "continuing to learn and develop her leadership style," that she "has very strong values . . . and implements these in her unit," and that Ross looked to improve the efficiency of her unit. Docket No. 103-9 at 3. The form does mention that Ross had "encountered some personnel issues and learned the importance of following policy." Id. Additionally, as Ross was applying to the assistant director position, she submitted letters of reference from individuals who stated that Ross was a leader, efficient and knowledgeable, and had always provided exceptional customer service. See Letter from Ashley Rutter, Docket No. 103-10; Letter from Katrina Davis, Docket No. 103-11. Just before being demoted, Ross received the Community Advocate of the Year Award from Work Force Investments. Ross Dep. 12:1-9. Powell testified that she did not consider this information about Ross' positive reviews relevant for purposes of investigating the complaints against Ross. Powell Dep. 76:6-10. She also did not attempt to substantiate Ross' denial of any of the problematic behavior. Id. 80:15-24.

On April 7, 2014, Ross filed a charge of discrimination against the Board, the Department, and the County of Franklin with the Virginia Council on Human Rights and the Equal Employment Opportunity Commission ("EEOC"). She received her right-to-sue letter from the EEOC on June 26, 2014. Ross filed her initial complaint on September 18, 2014, alleging claims of discrimination pursuant to 42 U.S.C. § 1981, Title VII, and the ADEA. The

6

court subsequently dismissed the Department and the County of Franklin in addition to Ross' § 1981 claim. The case is presently before the court on the Board's motion for summary judgment.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. Anderson, 477 U.S. at 255; see also Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248-49. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of the [non-movant's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).

## Discussion

### I. Title VII Claim

Ross alleges that she was demoted because of her race and that she was singled out because she was the only African-American supervisor. Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a). To survive summary judgment in a race discrimination case, the plaintiff must

7

present sufficient evidence from which a jury could conclude that racial discrimination was one of the employer's motives in taking the challenged adverse employment action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2523 (2013). The plaintiff may do this by presenting direct or circumstantial evidence of racial discrimination, or through the framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

The McDonnell Douglas framework is comprised of three steps: (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden of production then shifts to the employer to articulate a non-discriminatory reason for the adverse action; and (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is pretext for intentional discrimination. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-56 (1983)). "[T]he plaintiff's burden to show pretext 'merges with the plaintiff's ultimate burden of persuading the court that she was a victim of intentional discrimination.'" Guessous, 828 F.3d at 217 (citing Burdine, 450 U.S. at 256)). Accordingly, a plaintiff can prove pretext by showing that the defendant's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Under the McDonnell Douglas framework, the plaintiff establishes a prima facie case by demonstrating that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's

8

legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Hill v. Lockheed Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). Here, defendant contends that Ross cannot prove the third element of her prima facie case. Defendant further contends that plaintiff's prima facie case requires that she prove that she was subject to "different treatment from similarly situated employees outside the protected class" rather than that the position remained open or was filled by an applicant outside the protected class. Coleman v. Md. Court of Appeals, 626 F.3d 187 (4th Cir. 2010). Defendant argues that plaintiff cannot meet this last element.

As to the third element, defendant presents evidence demonstrating that plaintiff was placed on a performance improvement plan ("PIP") in March of 2013 after receiving a Group II Written Notice. As part of the plan, she received supplemental training on managing her emotions, communication, and conflict management. Ross Dep. 61:7-62:9. In November of 2013, after receiving complaints about Ross' behavior, Powell issued Ross a second Group II Written Notice. The Board's written policy provides for demotion or termination if an employee receives two Group II Written Notices within three years. See Docket No. 91-5 at 46-47. Defendant also notes that Ross acknowledged that Powell received these complaints, and if the complaints were true, they would be grounds for disciplinary action. Ross Dep. 36:7-11; 53:24-54:7.

Ross argues that there is a genuine issue of material fact as to whether she was performing her job adequately. She had been with the Department for several years and had previously received a promotion. She believes that this is sufficient to raise an inference that she

9

was performing her job adequately. See, e.g., Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir. 1996) (finding that thirty years with the employer and accompanying pay raises and promotions supported an inference that an employee was performing his job adequately enough to meet an employer's needs, "even when the evidence did not extend all the way to the time of discharge"). Ross also notes that her burden here is not onerous. See Murry v. Jacobs Tech., Inc., No. 1:10-CV-771, 2012 U.S. Dist. LEXIS 48169, at *33 (M.D.N.C. Apr. 5, 2012) ("[T]he Fourth Circuit has cautioned against the 'danger' that courts might apply the 'legitimate expectations' element of the prima facie case 'too strictly.'") (citing Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 516-17 (4th Cir. 2006)).

In further support of her case, Ross forecasts evidence that several individuals characterized her as a competent supervisor. See Letter from Ashley Rutter, October 18, 2013; Letter from Katrina Davis. Additionally, just prior to her demotion, Ross was a recipient of an advocacy award. Ross Dep. 12:1-14. Ross also argues that Brown's testimony demonstrates that the complaints against Ross were coerced and part of an effort to remove Ross from her position. See Brown Dep. at 9:1-19. Moreover, Powell only investigated the complaints against Ross, not the positive things others had to say. Powell Dep. 76:6-10.

Regarding the last prong of plaintiff's prima facie case, defendant argues that plaintiff cannot demonstrate a genuine issue of material fact as to whether the Board treated her differently than similarly situated employees outside of her protected class. Ross asserts that she need only demonstrate that "the position remained open or was filled by similarly qualified applicants outside the protected class." Hill, 354 F.3d at 285. Here, Turner, a Caucasian woman, assumed Ross' supervisory responsibilities. Ross' position, ultimately, remained unfilled until Ross was reinstated. Powell Dep. 93:10-12.

10

Furthermore, Ross argues that she has produced sufficient evidence to survive summary judgment even if she has to prove differential treatment. For example, Ross testified, "I'm the only black supervisor here, and . . . we have other workers that have supervisors that don't do anything and nobody says nothing, but when it comes to me, everybody has something to say." Ross Dep. 77:22-78:6. She explained that Caucasian supervisors could keep their office doors closed, but if Ross did so, she would be told she could not keep her door closed. Id. 16:1-9. Additionally, Ross testified that at least one other worker, Nesbit, agreed with Ross that she had not been promoted to supervisor sooner because of her skin color. Id. 120:5-22. Ross also heard from another employee that Brown had called Ross an "angry black woman." Id. 119:6-20. Finally, Ross claims she was excluded from supervisory meetings, but acknowledges that those at the meetings had no decisionmaking authority over Ross' employment. Id. 13:16-14:13. However, at a meeting of supervisors of which Ross was not a part, Powell learned of the complaints lodged against plaintiff and started her investigation. Powell Dep. 54:15-19.

From the evidence Ross has forecast, the court believes there remains a genuine issue of material fact as to whether plaintiff has established a prima facie case. Ross has presented evidence that she was performing her job satisfactorily, that Powell knew of this evidence but ignored it, that the complaints against her were both solicited and coerced, and that her position remained unfilled. Similarly, from her testimony, a reasonable juror could understand that Ross was treated differently than individuals outside of her class. This testimony is further bolstered by the facts that Ross was the only African-American supervisor, and that the adverse employment action occurred shortly after she returned from her honeymoon with her Caucasian husband. Ross Dep. 29:4-5. Although defendant may dispute plaintiff's version of events at trial, the court must credit plaintiff's testimony at summary judgment. See Croy v. Blue Ridge Bread,

11

Inc., No. 3:12CV00034, 2013 U.S. Dist. LEXIS 98734, at *14 (W.D. Va. July 15, 2013) (Conrad, J.). Accordingly, plaintiff has demonstrated a genuine issue of material fact as to her prima facie showing of racial discrimination.

Nevertheless, the court must determine whether defendant is entitled to judgment as a matter of law under the second and third prongs of the McDonnell Douglas burden-shifting analysis. Here, the Board asserts that it has met its burden of producing evidence of a legitimate, non-discriminatory reason for demoting Ross. After a formal investigation into the written and in-person complaints about Ross from at least ten individuals, plaintiff received her second Group II Written Notice within a three-year period. See LDSS Written Notice Form March 3, 2013, Docket No. 91-2 at 48; LDSS Written Notice Dec. 3, 2013, Docket No. 91-2 at 31. Typically, the issuance of two Group II Written Notices within a three-year period results in termination. See Docket No. 91-5 at 46-47. Furthermore, defendant argues that Turner never replaced Ross. The position remained open because it is the Board's policy not to fill a position while the removed individual still has grievance rights, which plaintiff was exercising. Turner Dep. 29:23-30:12. Powell also testified that Ross was on leave for one of the supervisory meetings from which plaintiff alleges she was excluded. Powell Dep. at 46:6-21.

The court believes that defendants have met their burden of articulating a legitimate, non-discriminatory reason for the adverse employment action: other employees had complained about plaintiff, these complaints were the basis for plaintiff's second disciplinary notice, and plaintiff's position remained unfilled because of Department grievance policies. Upon this showing, the burden shifts back to plaintiff to demonstrate that the proffered reason for the adverse employment action is a pretext for discrimination. However, in analyzing the third prong

12

of the McDonnell Douglas framework, the court takes heed of the Fourth Circuit's recent reminder that there is nothing "in the McDonnell Douglas burden-shifting framework that says 'a plaintiff must always introduce additional, independent evidence of discrimination.'" Guessous, 828 F.3d at 220 (citing Reeves, 530 U.S. at 149). "To the extent that the evidence supporting a plaintiff's prima facie case also undermines the employer's non-retaliatory justification, that evidence may be called upon by the trier of fact in determining whether or not the proffered justification is pretextual." Id.

In this case, the court recognizes that much of plaintiff's evidence is her own, uncorroborated testimony. It is plaintiff who alleges that she was called an "angry black woman." The only source for the conversation with Nesbit about plaintiff's long tenure at the Department without promotion is plaintiff herself. However, as the non-movant, the court is constrained to accept plaintiff's testimony as true. See Anderson, 477 U.S. at 255.

Furthermore, plaintiff does forecast evidence outside of her own testimony. For example, plaintiff's demotion occurred within temporal proximity to her wedding to a Caucasian man, of which Powell testified certain employees complained Ross made them watch a video. Powell Dep. 50:9-16. However, one employee who allegedly complained about being forced to watch the video also declared that she did not watch the video. Dec. of Thelma Lane Doss. While defendant produces evidence suggesting that plaintiff's supervisor knew that plaintiff's spouse is Caucasian long before the adverse action and that Powell has two mixed-race children, whether such facts are "not indicative of animus is of no moment [if] a reasonable jury would . . . be entitled to a different conclusion." Guessous, 828 F.3d at 221.

Similarly, an employee testified that she was coerced by a supervisor into complaining about Ross, and Powell told the supervisors to have complaining employees, none of whom were

13

of the same race as plaintiff, speak to Powell directly. Brown Dep. 11:21-23; Powell Dep. 53:5-14. Powell also conceded that she ignored information about Ross that was positive. Powell Dep. 76:1-10. Like with plaintiff's prima facie case, this evidence is compounded by the fact that plaintiff was the only African-American supervisor. Ross Dep. 29:4-5.

At this stage, Ross' "burden is only 'to produce sufficient evidence upon which one could find that the protected trait . . . actually motivated the employer's decision.'" Guessous, 828 F.3d at 221 (citing Hill, 354 F.3d at 286). Moreover, unlike plaintiff's age discrimination claim, she need not demonstrate that race was the "but for" cause of the adverse employment action. See id. at 216 ("For status-based discrimination claims, the employee must 'show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.'") (citing Nassar, 133 S. Ct. at 2523). In sum, the court believes that plaintiff has demonstrated a genuine issue of material fact as to whether the Board's proffered explanation for the demotion "is unworthy of credence" or otherwise probative of a discriminatory motive. Plaintiff is entitled to have a jury determine whether race motivated the decision to demote her. Accordingly, the court will deny defendant's motion for summary judgment as to the Title VII claim.

## II. Age Discrimination in Employment Act Claim

Ross also claims that the Board discriminated against her because of her age, in violation of the ADEA. To establish a prima facie case of age discrimination, a plaintiff must demonstrate (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was performing her job in a satisfactory manner at the time of the action; and (4) that the adverse employment action occurred under circumstances that raise a reasonable inference of unlawful age discrimination. See Hill, 354 F.3d at 285 (4th Cir. 2004). Oftentimes, an inference

14

of discrimination arises when plaintiff is replaced by someone substantially younger. See O'Conner v. Consolidated Coin Caterers, 517 U.S. 308, 312-13 (1996). There is no specific number that makes an individual "substantially younger."

Here, even if there remains a genuine issue of material fact as to whether plaintiff was performing her job in a satisfactory manner, the only evidence that the demotion occurred under circumstances that raise an inference of unlawful age discrimination is Ross' own speculative and conclusory testimony that more seasoned workers left and were replaced by younger workers, and that she, herself, was replaced by someone substantially younger. First, Turner, Ross' alleged replacement, was three years younger, and the court does not believe a reasonable jury would find this difference substantial. See Gibbard v. Potter, No. 5:05CV44, 2009 U.S. Dist. LEXIS 4031, at *19 (W.D.N.C. Jan. 20, 2009) (finding three- and four-year age differences insubstantial); Robinson v. Greenwood Cnty., No. 8:10-02192, 2011 U.S. Dist. LEXIS 145031, at *19 (D.S.C. Nov. 22, 2011) ("Moreover, . . . plaintiff's . . . age claim[] [is] further undermined by the fact that [her replacement], like the plaintiff, . . . is African-American and is insignificantly younger (three years)."). Second, nothing corroborates Ross' understanding that older workers were being replaced by younger individuals under suspect circumstances. When asked about the demographics at the Department, Powell postulated, "I guess some of the more senior people that were here and had spent their career here and have retired, but other than that, there has not been any significant changes." Powell Dep. 120:20-24. Nor does Ross provide a single specific example of other older workers being replaced by younger individuals. Simply put, plaintiff has not met her burden in demonstrating that there is a genuine issue of material fact as to her prima facie case of age discrimination. The court will grant defendant's motion for summary judgment as to the ADEA claim.

15

## Conclusion

For the reasons stated, the court will deny in part and grant in part defendant's motion for summary judgment. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to the defendant and all counsel of record.

DATED: This 27th day of March, 2017.

/s/ Glen E. Conrad
Chief United States District Judge